# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 5, 2024

Lyle W. Cayce
Clerk

_____

No. 23-60536

_____

Mid Valley Pipeline Company, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Kenneth Rodgers, *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; David T. Cochran, Jr., *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Katherine Crump, *in her Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Nott Wheeler, Jr., *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Roy Nichols, *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Paul Hollis, *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Hank Burdine, *in his Official Capacity as Commissioner of the Board of Mississippi Levee Commissioners*; Peter Nimrod, *in his Official Capacity as Chief Engineer of the Board of Mississippi Levee Commissioners*; Board of Mississippi Levee Commissioners,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:22-CV-25

_____

Before Clement, Engelhardt, and Wilson, *Circuit Judges*.

No. 23-60536

Cᴏʀʏ T. Wɪʟsᴏɴ, *Circuit Judge*:

This appeal stems from the district court's grant of summary judgment, dismissing Mid Valley Pipeline Company's claim arising under the Contract Clause of the United States Constitution. Because the operative document at issue—a permit—is not a contract, we affirm.

**I.**

Appellant Mid Valley Pipeline Company is an interstate pipeline company that transfers crude oil from Longview, Texas, to refineries in the Midwest. Mid Valley's pipeline system runs through Texas, Louisiana, Mississippi, Tennessee, Kentucky, Ohio, and Michigan. Defendants are members of the Board of Mississippi Levee Commissioners (the Levee Board) in their official capacities, the Levee Board itself, and the Levee Board's Chief Engineer.[1]

In 1949, the Levee Board granted Mid Valley a permit (the 1949 Permit) to construct and maintain two twenty-inch pipelines across the levee in Mayersville, Issaquena County, Mississippi. The 1949 Permit conferred permission to Mid Valley subject to "the compliance and observance of all of the following conditions":

> 1. The location and construction of the pipe line shall be subject to the approval of the Chief Engineer of the Board and the maintenance and use thereof shall also be subject to the approval of the Chief Engineer.

---

[1] The Mississippi Legislature created the Levee Board just months after the end of the Civil War. *See Nugent v. Bd. of Miss. Levee Comm'rs*, 58 Miss. 197, 209 (Miss. 1880) (noting the Levee Board's creation on November 27, 1865). The Mississippi Constitution tasks the Levee Board with, *inter alia*, the "supervision of the erection, repair, and maintenance of the levees" in its district. Mɪss. Cᴏɴsᴛ. art. 11 § 232. The levee district at issue spans Bolivar, Washington, Issaquena, Sharkey, and parts of Humphreys and Warren Counties.

. . .

3.  The pipes are to be laid on the surface of the enlarged sections and 400 feet to the landside and 150 feet to the riverside of the centerline of the main levee.  The pipes are to be covered with a 2 foot layer of dirt . . . .

. . .

5. [Mid Valley] shall never assert against the Board any claims for damages to the pipe lines constructed on the levee right of way.

6.  If at any time the Board, or its Chief Engineer shall deem it necessary to raise the levee or any land on which the pipe lines are constructed, by placing additional dirt thereon, it is agreed and understood that [Mid Valley] will make any necessary changes in the pipe lines and that no claim will be made against the Board for damages by reason thereof to the pipe lines.

7.  Failure to perform any stipulation contained herein imposed upon [Mid Valley] shall be sufficient to justify revocation of this permit.

8.  No changes or alterations are to be made in this installation without prior written consent of the Chief Engineer of the Board.

9. [Mid Valley] agrees to repair or restore the levee or right of way where any damage results from the construction or maintenance of the pipe line . . . .

The 1949 Permit is not limited to a term of years.  Indeed, the Levee Board has acknowledged that "the crossings are facilities [that] are present essentially for perpetuity."

In 2005, the Levee Board's Chief Engineer, Peter Nimrod, alerted Mid Valley that Mid Valley would need to relocate its pipelines by the summer of 2007.  After exchanging plans and specifications, Nimrod authorized Mid Valley to proceed with the pipeline relocation in February

2007. Mid Valley then spent more than $700,000 to move the pipeline crossing approximately 75 feet from the original location.

Some years later, in October 2020, Nimrod informed Mid Valley that:

> [d]uring the July 2020 Board meeting[,] the Board . . . decided that it is appropriate to charge every existing interstate pipeline crossing the levee a Pipeline Crossing Fee of $2,500 per pipeline per year. During the October 2020 Board Meeting[,] the Board voted to revoke and rescind all existing Permits . . . for all interstate pipelines that are not currently paying the Annual Pipeline Crossing Fee.
>
> Attached you will find a new Permit for Facilities that will need to be executed by Mid-Valley Pipeline Company . . . . Also, have the Mid-Valley Pipeline Company accounting office send the Board of Mississippi Levee Commissioners a check for $5,000 . . . for the 2020 Annual Pipeline Crossing Fee for [two] pipelines. Once we receive the executed Permit for Facilities and the check, we will execute the Permit . . . . The Annual Pipeline Crossing Fee will be due in October of each year.

Mid Valley never responded. Nimrod, acting on behalf of the Levee Board, sent similar notices to Mid Valley in December 2020, July 2021, and November 2021.

In January 2022, the Levee Board's counsel sent Mid Valley a letter advising that "the two (2) original pipelines have been removed, and the two (2) new pipelines installed in 2007[] are in a different location," such that Mid Valley's current pipelines were "in place without a permit." Echoing Nimrod's earlier correspondence, the letter also requested that Mid Valley execute the included new permit and remit a $5000 check "for the 2022 annual pipeline crossing fee for two (2) pipelines at $2500 each."

No. 23-60536

Mid Valley then filed suit against the Defendants, asserting a claim for violation of the Contract Clause of the United States Constitution,[2] claims under 42 U.S.C. § 1983, and various state-law claims. After cross-motions for summary judgment, the district court granted judgment for Defendants on Mid Valley's Contract Clause claim, reasoning that the 1949 Permit was not a contract.[3] The district court likewise denied Mid Valley's other federal-law claims and declined to exercise jurisdiction over Mid Valley's state-law claims.

Mid Valley now appeals, challenging the district court's grant of summary judgment as to its Contract Clause claim. Its primary contention is that, contra the district court's analysis, "the [B]oard's assertion of its subjective intent is irrelevant to the question of whether" the 1949 Permit amounts to a contract. The Levee Board, on the other hand, maintains that "[t]here was no mutual assent that the [P]ermit constituted a contract" between it and Mid Valley. For the reasons discussed herein, we agree that the 1949 Permit is not a contract, such that the district court's summary judgment for the Levee Board was proper.

## II.

We review *de novo* a grant of summary judgment, applying the same legal standards as the district court. *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020). Summary

---

[2] The Contract Clause states: "No State shall . . . pass any Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. I.

[3] The district court's holding was twofold: (1) Consideration was lacking, such that no contract was formed between the parties, and (2) in any event, the 1949 Permit is not a contract. The district court also concluded that, even assuming the 1949 Permit was a contract, the Levee Board's termination of it did not violate the Contract Clause. Because we agree that the 1949 Permit is not a contract, we need not address these additional issues.

judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Ahders v. SEI Private Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (citation and internal quotation marks omitted). "We construe all facts and inferences in the light most favorable to the nonmov[ant] . . . ." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005) (citation omitted).

## III.

Mid Valley argues that the Levee Board violated the Contract Clause of the United States Constitution by imposing annual pipeline crossing fees on Mid Valley that were not contemplated by the 1949 Permit and by rescinding and revoking the 1949 Permit when Mid Valley refused to pay. Mid Valley's position rests on the premise that the 1949 Permit is a contract, such that the Levee Board could not modify, i.e., impair, the parties' agreement by imposing annual fees or by unilaterally cancelling the Permit.

But there can be no impairment of a contract if no contract exists. *Cf. NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306, 329 (5th Cir. 2022) (affirming dismissal of a Contracts Clause claim because "[a]t a . . . basic level," appellant "did not have a concrete, vested right" that could suffer impairment); *see also Powers v. New Orleans City*, No. 13-5993, 2014 WL 1366023, at *5 (E.D. La. Apr. 7, 2014) ("There can be no impairment, unconstitutional or otherwise, of nonexistent contractual rights."), *aff'd*, 783 F.3d 570 (5th Cir. 2015). So before we reach Mid Valley's Contract Clause arguments, we must determine whether the 1949 Permit is a contract.

To do so, we look to state law. *See Colon de Mejias v. Lamont*, 963 F.3d 196, 202–03 (2d Cir. 2020) ("State law determines whether an agreement is an enforceable contract, but federal law ultimately resolves whether the

agreement is protected by the Contract Clause."). Under Mississippi law, a contract is formed when there exists "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Logan v. RedMed, LLC*, 377 So. 3d 956, 962 (Miss. 2024) (citation omitted). All these elements must be present for contract formation. *E.g.*, *Est. of Davis v. O'Neill*, 42 So. 3d 520, 527 (Miss. 2010).

The Levee Board zeroes in on mutual assent—and asserts there was none. To support its argument, the Levee Board relies on the Permit's text, specifically, that the Permit is entitled "Permit—Mid-Valley Pipeline Company: Pipeline Crossing—Station 6840"; mentions that it may be revoked by the Levee Board for Mid Valley's failure to comply with the Permit's conditions; and explicitly grants Mid Valley mere "permission" to act in accordance with the Permit.

Under Mississippi law, "[t]he assent of the parties in the formation of a contract must necessarily be gathered from their words, acts and outward expressions." *Hill v. Capps*, 160 So. 2d 186, 190 (Miss. 1964) (citation omitted). And from its "words, acts and outward expressions," *id.*, the 1949 Permit is just that—a unilateral permit given by the Levee Board as a "take-it-or-leave-it" allowance for Mid Valley to cross the levee under the conditions the Levee Board specified. From its title to its enumerated conditions to the right of revocation the Levee Board enjoyed, there is nowhere in evidence any mutual assent to form a contract.

This reading comports with Mississippi and federal courts' basic understanding of what a "permit" is, namely "[a] certificate evidencing permission; an official written statement that someone has the right to do something; License." *Permit*, BLACK'S LAW DICTIONARY (10th ed.

7

2014). Somewhat circular, the "hornbook definition of a license," in turn, is "[a] permit, granted by an appropriate governmental body, generally for a consideration . . . . A license is not a contract between the [granting governmental body] and the licensee, but is a mere personal permit." *Lichterman v. Pickwick Pines Marina, Inc.*, No. 1:07CV256-SA-JAD, 2010 WL 1709980, at *2 (N.D. Miss. Apr. 23, 2010) (citation omitted); *accord License*, Black's Law Dictionary (10th ed. 2014) (defining "license" as "[a] permission, usually revocable, to commit some act that would otherwise be unlawful"). The Mississippi Supreme Court has recognized that licenses to perform an activity are "not . . . contract[s] between the sovereign and the licensee." *Geiger v. Miss. State Bd. of Cosmetology*, 151 So. 2d 189, 191 (Miss. 1963) (citing *Davis v. Sheppherd*, 139 So. 2d 668 (Miss. 1962)); *cf. State Highway Comm'n of Miss. v. McDonald's Corp.*, 509 So. 2d 856, 862 (Miss. 1987) (analyzing whether "compensation is due" upon the revocation of a state-issued permit—not whether the permit's revocation was a contract breach).

Deflecting from the 1949 Permit's text, Mid Valley posits that courts must "analyze the nature of permits and the nature of the activities or construction they authorize to determine whether what is called a permit is actually a contract." Mid Valley relies upon *Son Broadcasting, Inc. v. United States*, 52 Fed. Cl. 815 (Fed. Cl. 2002). In that case, the Court of Federal Claims analyzed whether a special use permit the U.S. Forest Service issued per 36 C.F.R. § 251.51, which authorized the construction of a broadcast tower, was a contract. The court held that it was, in part because the special use permit required "the long-term protection that a mutually-binding agreement would provide" to allow the permittee to make the "substantial" investment contemplated by the special use permit. *Son Broadcasting*, 52 Fed. Cl. at 824. Applying that principle here, Mid Valley maintains that the nature of the 1949 Permit—namely its implied invitation for Mid Valley to

make large investments in the pipelines subject to it—should render the 1949 Permit a contract.

But *Son Broadcasting* does little to move the needle in Mid Valley's favor. True enough, *Son Broadcasting* and other cases from the Court of Federal Claims and the First Circuit provide a general framework for determining whether a permit can be treated as a contract. *E.g.*, *id.* at 822 ("[A]n examination of the language and characteristics of [a] permit is critical to the determination" of whether "a particular permit constitutes a binding contract."); *see also Meadow Green-Wildcat Corp. v. Hathaway*, 936 F.2d 601, 603–05 (1st Cir. 1991).[4] Those cases have considered, *inter alia*, whether: the permit creates "affirmative obligations" on the government's behalf, *Hage v. United States*, 35 Fed. Cl. 147, 166–67 (Fed. Cl. 1996); the permit is non-transferable, *id.* at 166; the government reserved the right to cancel the permit, *id.* at 167; the permit has "contract-like language" (i.e., the "document itself reads like a contract"), *Hathaway*, 936 F.2d at 604; and the permit entails expensive investment or development that a mutually-binding agreement could serve to protect, *Son Broadcasting*, 52 Fed. Cl. at 824.

Mid Valley's emphasis on the singular characteristic it shares with the plaintiff in *Son Broadcasting*—that both permittees made large investments in reliance on their respective permits—is in the end unavailing. The *Son Broadcasting* court did not give this characteristic special weight or preeminence. Indeed, it was of particular import there that "the Forest

_____

[4] Neither party has cited to, nor have we found, cases from Mississippi courts or this court that have engaged in the sort of analysis undertaken by the Court of Federal Claims and the First Circuit. Thus, we look to these out-of-circuit cases as persuasive authority. *See Ferraro v. Liberty Mut. Fire Ins. Co.*, 796 F.3d 529, 533 (5th Cir. 2015) (relying on persuasive authority to decide a matter of first impression).

Special Use Permit" at issue "possess[ed] contract characteristics." *Son Broadcasting*, 52 Fed. Cl. at 823. Namely, that permit "imposed affirmative obligations" on both the U.S. Forest Service and the permittee not ordinarily seen in the context of a revocable license. *Id.* at 823–24.[5]

Instead, the 1949 Permit is more akin to the permit at issue in *Hage*. There, the Court of Federal Claims concluded that the grazing permit issued by the U.S. Forest Service was a revocable license. *Hage*, 35 Fed. Cl. at 167. The *Hage* court reasoned that the "permit evidence[d] no intention on behalf of the government to create a contract" because the permit did "not create affirmative obligations" on the part of the agency; it could not be legally assigned or transferred; and the agency could modify or "cancel the permit in its totality" as it deemed necessary. *Id.* at 166–67.

The same is true here. Despite its significant investment in its pipelines, including their 2007 relocation, Mid Valley does not identify any affirmative or mutual obligations the Levee Board owed stemming from the 1949 Permit—because none are apparent in its express terms. Indeed, the Levee Board's requirement that Mid Valley relocate its pipelines demonstrates the point: Mid Valley complied, though there was no mutuality whatsoever in the Levee Board's requiring the move. Additionally, the Permit does not contemplate assignment or transfer because it grants

---

[5] The *Son Broadcasting* court detailed that the permit at issue "clearly imposed affirmative obligations on the Forest Service[,]" including that the Forest Service would require additional users of the broadcast tower to pay the permittee "a fair share of the original expense borne" in the tower's construction. 52 Fed. Cl. at 823. And the Forest Service's ability to "authorize joint use" of the broadcast tower was itself "subject to at least two conditions that explicitly protect[ed] [the permittee's] investment." *Id.* Accordingly, that permit's "plain language . . . impose[d] binding obligations on both parties." *Id.* at 824. By contrast, Mid Valley points only to the Levee Board's 1949 grant of "permission to [Mid Valley to] build its pipeline facilities" as an obligation of the Levee Board.

permission only to Mid Valley.  Finally, the Levee Board retained the right to revoke the 1949 Permit upon Mid Valley's failure to comply with any of the Permit's conditions.

The 1949 Permit's straightforward, unambiguous text makes clear that the parties lacked the mutuality of assent to enter a contract.  *See Hill*, 160 So. 2d at 190 ("The assent of the parties in the formation of a contract must necessarily be gathered from their words, acts and outward expressions.").  Thus, the 1949 Permit falls within the mine run of similar government-issued permits, or licenses, which are not contracts under either Mississippi law or the other authorities discussed above.  Mid Valley's Contract Clause claim therefore necessarily fails.

AFFIRMED.